CHERYL KING,

                Plaintiff,          Case No. 07-11810

      vs.                    DISTRICT JUDGE JOHN FEIKENS
                             MAGISTRATE JUDGE STEVEN D. PEPE

PATRICIA CARUSO, RICHARD STAPLETON
AND ANN BAERWALDE,

                Defendants.
============================/

## REPORT AND RECOMMENDATION

Plaintiff is a civilian whose husband, Kevin King, is under the jurisdiction of the Michigan Department of Corrections (MDOC) and is currently housed at Chippewa Correctional Facility. On April 26, Plaintiff filed a Complaint against Defendants Patricia Caruso, Director of MDOC, Richard Stapleton, Administrator at Office of Legal Affairs, and Ann Baerwalde, Administrative Law Examiner, claiming they have violated her First Amendment rights, her Equal Protection rights, and her Fourteenth Amendment Due Process rights. On June 27, 2007, Defendants Patricia Caruso, Richard Stapleton and Ann Baerwalde filed their motion for summary judgment under Fed. R. Civ. P. 56(b) arguing that Plaintiff has failed to show any genuine issue as to any material fact, and that they are entitled to judgement as a matter of law (Dkt. #7). Defendants' motion was referred for report and recommendation on September 10, 2007, pursuant to 28 U.S.C. §§ 636(b)(1)(B)(Dkt. #13). For the reasons stated below, it is RECOMMENDED that Defendants' motion be GRANTED.

## I.      BACKGROUND FACTS

In February 2006, Internal Affairs began investigating Plaintiff and her husband, inmate King, after it received information from an informant, James Klein, that Plaintiff and her husband were planning, with the assistance of MDOC employees,[1] to smuggle a cell phone into the prison (Dkt. #7, Ex. 13).  On February 9, 2006, Plaintiff received notice of a proposed visitor restriction and that a hearing was to be held based on an accusation that Plaintiff and her husband were conspiring to smuggle a cell phone into the prison inside a cribbage board (Dkt. #7, Ex. 3).[2]  Plaintiff requested a hearing in accordance with Michigan's Administrative Procedure Act (APA) of 1969 (Cplt, ¶ 1).  Yet, Plaintiff alleges that Defendants denied her request.  *Id.*

On July 24, 2006, Defendant Baerwalde conducted a hearing, pursuant to MCL 791.251, in Plaintiff's absence.  Plaintiff claims that she did not attend this hearing because she was not given notice of the date.  Yet, an original notice of proposed visitor restriction was first presented to Plaintiff on February 9, 2006, and included a hearing date of March 15, 2006 (Dkt. #7, Ex. 3). Plaintiff refused to sign the notice.  Nevertheless, Defendant Baerwalde adjourned the hearing from March 15, 2006, because Plaintiff requested a waiver of time limits until the Michigan State Police Investigation had been completed (Dkt. #7, Ex. 7; Cplt, Ex. C).

---

[1] Resident Unit Officer Mark Jones and Maintenance Mechanic Joe Furtah.

[2] Plaintiff asserts in her brief in response to the motion for summary judgment that on or about February 9, 2006, she received a letter from MDOC personnel stating that they were going revoke Plaintiff's visiting privileges based on her conspiring to smuggle contraband into the prison (weapons to kill a guard) (Dkt. #8, p. 2).  Specifically, Plaintiff states in her response brief that notice was "intending to revoke her visiting privileges based on conspiring to smuggle in weapons to kill a guard."  Yet, this is incorrect. See, Dkt. #7, Ex. 3.  The information provided by the confidential informant, James Klein, was that first they would try to smuggle in a cell phone then later a gun to possibly kill a guard.

A notice of the July 24, 2006, hearing date was mailed to Plaintiff by Investigator Gunter on July 14, 2006 (Dkt. #7, Ex. 8, p. 1), but Plaintiff claims she did not receive this notice. Defendant Baerwalde conducted a hearing on July 24, 2006, pursuant to MCL 791.251. The hearing was based on the allegations of smuggling in a cell phone, not weapons. At the hearing, Defendant Baerwalde found that Plaintiff had received notice of the hearing and thus the hearing was held without her in accordance with R791.3315.39. Plaintiff attaches to her Complaint the Administrative Hearing Report, which contains a finding by Defendant Baerwalde that Plaintiff had received written notice of the hearing and had chosen voluntarily not to attend (Cplt, Ex. C).

Plaintiff alleges that Defendants have violated her First Amendment rights, her Equal Protection rights, and her Fourteenth Amendment Due Process rights because the July 24, 2006, hearing was held outside of her presence, she was denied discovery or cross examination of witnesses or evidence, they refused to create any formal record or ask witnesses questions, and deemed the investigation and all material confidential (Cplt, ¶ 1).

Before the hearing held on July 24, 2006, Plaintiff requested copies of the Internal Affairs investigation pertaining to her husband, which was denied (Cplt, Ex. B). She attaches to her Complaint the MDOC Response to Freedom of Information Act ("FOIA") Appeal in which her request is denied. Defendant Caruso denied the FOIA appeal because the MDOC employee investigative files are personnel records and are exempt from disclosure. *Id*. MCL 791.230a prohibits the release of MDOC employees' personnel records.

Plaintiff submitted a request for a rehearing regarding the visitor restriction because she alleges that the hearing was conducted in her absence without notice that it had been rescheduled (Cplt, Ex. D). A rehearing was approved by Defendant Stapleton because Plaintiff's husband,

Prisoner King, was not given notice of the prior hearing nor an opportunity to submit a statement to be considered by the hearing officer. *Id.* The rehearing was conducted on April 11, 2007, pursuant to R 791.3315 and R 791.6611, and the visitor restriction was upheld (Dkt. #7, Ex. 4, Att. 4-C). Plaintiff was present at this hearing, but claims that the rehearing also was in violation of her procedural due process safeguards.

Plaintiff now attacks the credibility of the informant, James Klein, whom both hearing officers found credible (Dkt. #7, Ex. 4, Att. 4-A & 4-C). On June 19, 2007, Plaintiff conducted a deposition pursuant to MCR 2.306 and 2.315 on the informant, James Klein (Dkt. #8, Ex. F). This deposition was held in conjunction with Plaintiff's and her husband's state court defamation lawsuit against Mr. Klein. Plaintiff states that Mr. Klein never sought confidential status from Defendants (Dkt. #8, p. 2). In fact, Mr. Klein stated that he asked to have his record sealed (Dkt. #8, Ex. F, Video Dep, 1:53:53). Plaintiff also states that Mr. Klein says he has a lying problem (Dkt. #8, pp. 2-3). In the deposition Mr. Klein says that he once stated in court that in the past he used to have a problem lying (Dkt. #8, Ex. F, Video Dep, 1:58:29). He stated that he has lied about "several things" in the past, but that his account of the actions between Plaintiff and himself was accurate (Dkt. #8, Ex. F, Video Dep, 1:59:56). Plaintiff also claims that Mr. Klein said that he never mentioned any MDOC staff names to investigators (Dkt. #8, p. 2). Yet, Mr. Klein stated that he told investigators about a maintenance man he knew at the time of the video deposition to be Joe Furtah (Dkt. #8, Ex. F, Video Dep, 2:13:02). Mr. Klein also stated that he gave the name of Resident Unit Officer ("RUO") Mark Jones to Internal Affairs because Plaintiff's husband had told him that "Mark Jones had helped him in the past" (Dkt. #8, Ex. F, Video Dep, 2:13:39 – 2:13:58).

Consistent with the information provided to Internal Affairs, Mr. Klein stated at his deposition that he and Plaintiff discussed smuggling weapons and "other things" into the facility (Dkt. #8, Ex. F, Video Dep, 1:53:22). Consistent with the information Klein provided Internal Affairs, he also stated he wanted his record sealed regarding smuggling in the cell phone (Dkt. #8, Ex. F, Video Dep, 1:53:52). Plaintiff claims that her husband and all MDOC staff were exonerated, and refers to her Exhibit K (Dkt. #8, p. 3). Yet, Exhibit K does not support Plaintiff's contention. That exhibit is composed of three short letters between Plaintiff's husband, Kevin King, and Mr. Marschke of Internal Affairs regarding whether inmate King had filed a complaint (Dkt. #8, Ex. K).

Plaintiff also states the Klein "tried to sell his story," referring to her Exhibit H (Dkt. #8, p. 10). Plaintiff's Ex. H is Mr. Klein's April 5, 2007, Motion to Modify the restitution portion of his sentence; Plaintiff's statements makes it appear that Mr. Klein was trying to sell rights for a potential book. In fact, Mr. Klein's motion to reduce his restitution was denied, and he specifically denied "selling info for leniency." (Dkt. #8, Ex. F, Video Dep, 2:04:17).

At both the hearing and the rehearing, the hearings officers considered the information provided by Mr. Klein and made the following factual findings to support the conspiracy to smuggle in contraband. In the hearing held on July 24, 2006, Defendant Baerwalde found that:

> The information requested by Ms. King is held confidential as it does reveal information related to the security of the facility. The information is also not released for the safety of the witness. I find that the information is credible given the documents that were presented, the detail of the report, and the notes and letters provided that are from Ms. King in addition to the photograph of the cell phone and the receipt showing it was purchased by Cheryl King on 2-5-06. The information in its entirety is convincing to me that the informant had been requested by Ms. King to alter a cribbage board, was given the cell phone purchased by Ms. King and the power adapter, and given instructions on how to alter both the cribbage board and the adapter to have the items delivered to prisoner King inside the prison by giving

the items to an employee to bring through the gates. I find given the entirety of the summary of the interviews, the summary of the telephone calls listened to and the written letters to Ms. King that the information is credible, detailed and consistent. The source of the information, the person who was said to have watched the King home and the informant, is found to be credible given the physical evidence that was obtained and the receipt showing this phone was purchased by Ms. King.

(Dkt. #7, Ex. 4, Att. 4-A).

In the rehearing which occurred on April 11, 2007, the hearings officer made the following factual findings:

Visitor Cheryl Champine-King asked James Klein to hollow out a cribbage board for her so that she could hide a cell phone in the cribbage board and have it brought to her husband Prisoner King in MRF without staff authorization on or before 2-8-07. I find that she took steps in furtherance of this act as James Klein was given diagrams as to how to hollow out the board and she purchased the cell phone on 2-5-07 then left it with a note for James Klein at her house for James Klein to pick up on 2-8-07. I find that the information regarding the internal investigation of the employees is confidential and is not to be turned over to Ms. King before or after the hearing and she knew the substance of the allegations and who made the allegations and even had her attorney review the information so she clearly knew enough information to prepare a defense. . . . I find that James Klein's statements are credible because his statement is supported by the evidence and facts that occurred during the investigation.

(Dkt. #7, Ex. 4, Att. 4-C).

Finally, Plaintiff states that Defendants did not have judicial authority to investigate Plaintiff by their own Policy Directive 01.01.140(G). This policy directive states that Internal Affairs can investigate employee misconduct (Dkt. #10, Ex. 20, PD 01.01.140, "Internal Affairs" (eff 10/18/99)). Internal Affairs was investigating the information they had that Plaintiff and her husband were attempting to smuggle in the cell phone with the help of MDOC employees. Thus the investigation appears to fall under Policy Directive 01.01.140(G).

II. ANALYSIS

## A.     Legal Standards

Under Fed. R. Civ. P. 56, summary judgment is to be entered if the moving party demonstrates there is no genuine issue as to any material fact.  The Supreme Court has interpreted this to mean that summary judgment should be entered if the evidence is such that a reasonable jury could find only for the moving party.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986).  The moving party has "the burden of showing the absence of a genuine issue as to any material fact." *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970).  *See also Lenz v. Erdmann Corp*., 773 F.2d 62 (6th Cir. 1985).  In resolving a summary judgment motion, the Court must view the evidence in the light most favorable to the non-moving party.  *See Duchon v. Cajon Co.*, 791 F.2d 43, 46 (6th Cir. 1986).  But as the Supreme Court wrote in *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986):

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.  The moving party is "entitled to a judgment as a matter of law" because the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

Moreover, when a motion for summary judgment is filed, the adverse party may not merely rely "upon the mere allegations or denials of the adverse party's pleading, but . . . by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).

## B.     Factual Analysis

Plaintiff brings both a substantive due process claim under the First Amendment as

incorporated in to the Fourteenth Amendment, as well as a procedural due process claim under

the Fourteenth Amendment. The Due Process Clause of the Fourteenth Amendment states that

no State shall "deprive any person of life, liberty, or property, without due process of law."

While a literal reading of the Clause suggests that it governs only the procedures by which a

state may deprive persons of liberty, it has for years been understood to contain a substantive

component as well.

> Procedural due process guarantees only that there is a fair decision-making process
> before the government takes some action directly impairing a person's life, liberty
> or property. This aspect of the due process clauses does not protect against the use
> of arbitrary rules of law which are the basis of those proceedings. It is only necessary
> that a fair decision-making process be used; the ultimate rule to be enforced need not
> be a fair or just one.

Rotunda & Nowak, Treatise on Constitutional Law-Substance & Procedure § 14.6 (4th ed. West
2007).

> The Due Process Clause guarantees more than fair process, and the "liberty" it
> protects includes more than the absence of physical restraint. *Collins v. Harker
> Heights,* 503 U.S. 115, 125, 112 S.Ct. 1061, 1068-1069, 117 L.Ed.2d 261 (1992)
> (Due Process Clause "protects individual liberty against 'certain government actions
> regardless of the fairness of the procedures used to implement them' ") (quoting
> *Daniels v. Williams,* 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986)).
> The Clause also provides heightened protection against government interference with
> certain fundamental rights and liberty interests. *Reno v. Flores,* 507 U.S. 292, 301-
> 302, 113 S.Ct. 1439, 1446-1447, 123 L.Ed.2d 1 (1993)

*Washington v. Glucksberg* ,521 U.S. 702, 719-720 (1997).

1.      *Plaintiff's First Amendment right of freedom of association was not violated
        when her right to visitation was permanently withdrawn.*

Plaintiff claims that her substantive rights of association with her husband under First

Amendment as incorporated in to the Fourteenth Amendment are violated by the permanent ban on visitation. The contours of First Amendment rights of inmates or their visitors are somewhat opaque. The Sixth Circuit has stated, "Prison inmates have no absolute constitutional right to visitation . . . . Limitations upon visitation may be imposed if they are necessary to meet penological objectives such as . . . rehabilitation and the maintenance of security and order." *Bellamy v. Bradley*, 729 F.2d 416 (6th Cir. 1984). Yet, that case considered an Eighth Amendment challenge in a case where a girlfriend was excluded on occasion from visits for, among other visitor infractions, bringing a picnic tablecloth and petroleum jelly into the prison. The record is limited due to the lack of a lower court opinion. In Judge Keith's opinion, he notes that:

> These incidents do not rise to the level of an Eighth Amendment violation. Prison inmates have no absolute constitutional right to visitation. *Newman v. Alabama,* 559 F.2d 283 (5th Cir. 1977), *rev'd in part sub nom, Alabama v. Pugh,* 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978). Limitations upon visitation may be imposed if they are necessary to meet penological objectives such as the rehabilitation and the maintenance of security and order. *Lynott v. Henderson,* 610 F.2d 340 (5th Cir. 1980).
>
> There were legitimate penological concerns for security in each incident cited by Bellamy as harassment of a visitor.

*Id*. at 420.

*Bellamy's* short treatment of the visitation issue did not address any First Amendment claims regarding a *permanent* ban of a spouse nor any procedural due process issues.

A few years later, then Circuit Judge Ruth Bader Ginsburg in *Robinson v. Palmer,* 841 F.2d 1151 (D.C. Cir. 1988), did address a ban on a visit from a spouse who had smuggled marijuana into the Lorton corrections facility. *Robinson* first addressed a procedural due process

issue which in this case is analyzed in the next section.[3]  *Robinson* also addressed a First

Amendment challenge to the Department's permanent denial of face-to-face communications

between husband and wife which plaintiffs claimed curtailed the couple's right to maintain a

marital relationship without "reasonably compelling" cause to do so.  The Robinsons did not

challenge the propriety of subjecting Mrs. Robinson to sanctions for carrying contraband into

Lorton, but confined their challenge to the propriety of a *permanent* suspension of visiting

privileges.  The D.C. Circuit rejected this First Amendment claim:

> Because of the security objections behind the contraband policy and the dangers
> posed by the introduction of contraband into Lorton, the Court cannot conclude
> that it is unreasonable for prison officials to adopt a permanent suspension policy.

---

[3]  Reversing the district court, the D.C. Circuit rejected Mrs. Robinson's claim that a
letter giving her notice that she was barred from visiting her husband for one year did not create
a liberty interest requiring a hearing before the warden could, under new rules, extend the period
to a permanent bar.  It noted that reasonable expectations did not create liberty interests, citing
*Jago v. Van Curen,* 454 U.S. 14(1981), which said that a Parole Board's notice that an inmate
would be granted an early release did not create a protected liberty interest that required a
hearing before that decision could be rescinded.  Citing *Jago,* 454 U.S. at 19, *Robinson*
cautioned:

> As the Supreme Court has cautioned us, protected interests in the prison setting are
> "necessarily limited":
>
>> We would severely restrict the necessary flexibility of prison
>> administrators and parole authorities were we to hold that any one of
>> their myriad decisions with respect to individual inmates may . . .
>> give rise to protected "liberty" interests which could not thereafter be
>> impaired without a constitutionally mandated hearing under the Due
>> Process Clause.

*Robinson,* 841 F.2d at 1155-56.

There was no claim that a liberty interest against a total and permanent visitation right
with a spouse derived, not from the one year notice letter, but from the inherent contours of the
due process clause, thus *Robinson* cannot be said to have resolved that issue.

*Id.* at 1156.

It was noted that the plaintiffs had alternate channels of communication available to them – letters, telephone, messages conveyed through other members of the family whose visitation had not been restricted.

> The Supreme Court, in upholding a jail policy denying pretrial detainees contact visits with their spouses, relatives, children, and friends, took "judicial notice that the unauthorized use of narcotics is a problem that plagues virtually every penal and detention center in the country." *Block v. Rutherford,* 468 U.S. 576, 588-89, 104 S.Ct. 3227, 3234, 82 L.Ed.2d 438 (1984). Moreover, in the very case in which the Supreme Court held impermissible a prison regulation effecting an "almost complete ban" on marriage by inmates, *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 2267, 96 L.Ed.2d 64 (1987), the Court reiterated:

>> [W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is  valid if it is reasonably related to legitimate penological interests. In our view, such a standard is necessary if "prison administrators . . . and not the courts, [are] to make the difficult  judgments concerning institutional operations."

> *Id.* 107 S.Ct. at 2261, quoting *Jones v. North Carolina Prisoners' Union,* 433 U.S. 119, 128, 97 S.Ct. 2532, 2539, 53 L.Ed.2d 629 (1977); *see also id.* 107 S.Ct. at 2267. The Court upheld in *Turner* a Missouri regulation restricting inmate-to-inmate correspondence, 107 S.Ct. at 2263-64, and stated that an inmate's marriage is indeed "subject to substantial restrictions as a result of incarceration," *id.* at 2265, although the restrictions imposed must be "reasonably related to legitimate penological objectives," *id.* at 2267, including "legitimate security concerns." *Id.* at 2266.

The D.C. Circuit noted that while *Turner v. Safley,* 482 U.S. 78 (1987), held impermissible a prison regulation effecting an "almost complete ban" on marriage by inmates,[4] the Supreme Court nonetheless reiterated:

---

[4] Notwithstanding the limitations on a normal marital relationship when one spouse is incarcerated, considering the multiple other values of marriage that still remain the *Turner* Court determined that "[t]aken together, we conclude that these remaining elements are sufficient to form a constitutionally protected marital relationship in the prison context." *Turner* ,482 U.S. at 96.

> [W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests. In our view, such a standard is necessary if "prison administrators . . . and not the courts, [are] to make the difficult judgments concerning institutional operations."

The *Robinson* court concluded on the First Amendment issue concerning a permanent ban on spousal visitation:

> The suspension policy at issue, while unyielding, surely furthers the legitimate government objective of staunching the flow of drugs into the prison system; it avoids the risk that "special treatment" of any class of visitors will prompt resentment among the inmate population; and it leaves open some communication channels, albeit less satisfactory ones, between inmate and excluded spouse. In light of the serious disruption that the introduction of drugs into a penal facility may cause, we cannot say that the Department's current policy is an "exaggerated response" to the perceived threat. *See Turner,* 107 S.Ct. at 2262. We therefore affirm the district court's dismissal of the Robinsons' first amendment claim.

*Id.* at 1156-1157.

Plaintiff in the present case claims that because she is not a prisoner, cases like *Bellamy* should not affect her (Dkt. #8). Yet, the fact that this Plaintiff is not a state prisoner does not give her greater constitutional rights in this area. The Sixth Circuit has specifically extended its holding to visitors. *Thacker v Campbell*, 1998 WL 537599 at *2 (6th Cir. 1998), stated that "Prison officials may impinge on a prisoner and his visitor's First Amendment rights if their actions are reasonably related to legitimate penological interests."

Plaintiff also claims in her response that the case of *Robinson v Palmer*, 841 F.2d 1151 (D.C. Cir. 1998), has no parallel to her case (Dkt. #8, p. 4). Plaintiff claims that the plaintiff in *Robinson* was afforded complete due process of law and guilt was established, but that is not the case in her situation. Yet, as noted below in dealing with Plaintiff's procedural due process claim, Plaintiff in this case was afforded the process due when a hearing was held in accordance with MCL 791.251 to determine if her husband was going to be able to receive her as a visitor.

Plaintiff also alleges that she, unlike the plaintiff in *Robinson*, was never accused of bringing any item into the prison. Even though Plaintiff was not caught in the act, as was the plaintiff in *Robinson*, MDOC found that Plaintiff nonetheless participated in behavior that was grounds for terminating her visitation. There is no basis for this Court to second guess or overturn that finding.

Plaintiff also contends that this case is "highly distinguishable from any such case because nothing has been claimed to be associated with misbehavior during visitation" (Dkt. #8, p. 5). Yet, in accordance with PD 05.03.140(QQ), the behavior does not have to occur in connection with a visit:

> QQ. The behavior described in Paragraphs OO and PP, subparagraphs 1 through 3, need not have occurred in connection with a visit. For example, a person who leaves contraband in another area of the facility grounds for the prisoner to pick up, mails contraband to a prisoner, or discusses escape plans with a prisoner over the telephone may be subject to a visitor restriction.

(Dkt. #7, Ex. 1, p. 9 of 13).

Finally, Plaintiff relies on *Overton v Bazzetta*, 539 U.S. 126, 131 (2003), when she states that the Constitution protects "certain kinds of highly personal relationships." (Dkt. #8, p. 6). The *Overton* case was brought by prisoners, their friends, and their family members complaining of MDOC regulations concerning non-contact visiting. In that case, the Supreme Court stated:

> And, outside the prison context, there is some discussion in our cases of a right to maintain certain familial relationships, including association among members of an immediate family and association between grandchildren and grandparents. *See Moore v. East Cleveland*, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (plurality opinion); *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923).
>
> This is not an appropriate case for further elaboration of those matters. The very object of imprisonment is confinement. Many of the liberties and privileges enjoyed by other citizens must be surrendered by the prisoner. An inmate does not retain

13

> rights inconsistent with proper incarceration. *See Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 125, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977); *Shaw v. Murphy*, 532 U.S. 223, 229, 121 S.Ct. 1475, 149 L.Ed.2d 420 (2001). And, as our cases have established, freedom of association is among the rights least compatible with incarceration. *See Jones, supra*, at 125-126, 97 S.Ct. 2532; *Hewitt v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). Some curtailment of that freedom must be expected in the prison context.

*Id*. at 131.

Therefore, although the Constitution does protect certain types of highly personal relationships, some curtailment of freedom of association must be expected in the prison context. *Id.* "It is clear that a prisoner does not have a due process right to unfettered visitation. . . . *a fortiori*, a citizen simply does not have a right to unfettered visitation of a prisoner that rises to a constitutional dimension." *Spears v Sowders*, 71 F.3d 626, 629-30 (6th Cir. 1995). Furthermore, prison officials may encroach on a visitor's First Amendment rights if they are reacting to a reasonably related penological interest. *Thacker v Campbell*, 1998 US App LEXIS 18762 at *5, *6.

Here, the Defendants' actions, as found by MDOC after its hearing, were reasonably related to legitimate penological interests. The MDOC promulgated new regulations that limited prison visitation in response to concerns about prison security problems. *Overton*, 539 U.S. at 126. It became more difficult for prison officials to prevent smuggling or trafficking in drugs and to maintain order during visitation. *Id.* Policy Directive 05.03.140 (eff. 01/12/1998). The same can be said about legitimate penological concerns regarding inmates having cell phones. These items are "contraband" in the prison. "Prisoner Visiting" was in effect at the time the prisoner's visitation was revoked. The policy directive states, in pertinent part, as follows:

> PP. In the situations described below, a visit shall be terminated or disallowed and the prisoner and visitor notified that the facility will be requesting a permanent

14

restriction of the visitor's visits with all prisoners:

> 1. The visitor smuggles, conspires to smuggle, or attempts to smuggle any item into or out of the facility. . . .

(Dkt. #7, Ex. 1, p. 9-13).

Michigan Administrative Code Rule, R791.6609 states in the pertinent part:

> (2) The approved visitors list shall be subject to all of the following restrictions:
>
> (f) A warden may deny placement of anyone of a prisoner's approved visitors list for reasons of safety or security of the institution, protection of the public . . . or for other cause as determined by the warden.
>
> ***
>
> (4) Each institution shall prescribe and display reasonable rules of conduct for visits to preserve public safety and institutional security and order. . . . If a prisoner or visitor violates the provisions of this subrule, then the visit may be terminated and the prisoner and visitor may be subject to sanctions up to and including a permanent restriction of all visits. . .
>
> ***
>
> (13) Nothing in this rule creates an enforceable right of the prisoner to receive a visit or of a visitor to visit a prisoner.

(Dkt. #7, Ex. 2, p. 5 of 7).

Michigan Administrative Code Rule, R 791.6611 states in the pertinent part:

> (2) A visitor shall be permanently restricted from visits at all facilities if any of 1 of the following occurs:
>
> (a) The visitor smuggles, or conspires or attempts to smuggle, an item into or out of the facility.

(Dkt. #7, Ex. 2, p 7 of 7).

Internal Affairs investigated Plaintiff and her husband, inmate King, after it received

information that they were planning, with the assistance of some MDOC employee, to smuggle

in a cell phone. Prisoner officials were attempting to meet the penological objective of reducing

smuggling and keeping the institution safe. "Withdrawing visitation privileges is a proper and even necessary management technique to induce compliance with the rules of inmate behavior." *Overton,* 539 U.S. at 134.

Because prison inmates have no constitutional right to visitation, and because the Plaintiff does not have any greater constitutional rights in this area, the limitation on visitation related to the legitimate penological interest of preventing smuggling. Thus, this restriction was not a violation of Plaintiff's First Amendment right of freedom of association.[5]

**2.    *Plaintiff's Due Process Rights Were Not Violated.***

Procedural due process questions for violation of a liberty interest are examined in two steps: the first step asks if there is a liberty interest that has been interfered with by the State, *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 571 (1972); the second step asks whether the procedures used upon that deprivation were constitutionally sufficient. *Hewitt v. Helms*, 459 U.S. 460, 472 (1983). Thus, to state a claim for deprivation of a liberty interest without due process required by the Fourteenth Amendment, Plaintiff is required to plead not only the deprivation, but also the inadequacy of the state remedies for redress of the deprivation.

**A.    *A Liberty Interest***

"The types of interests that constitute 'liberty'. . . for Fourteenth Amendment purposes are not unlimited; the interest must rise to more than 'an abstract need or desire,' *Kentucky Dept*

---

[5] Plaintiff claims that if she would have been convicted of a crime in a court of law she could visit her husband, but because she is accused of violating a rule, she is permanently banned (Dkt #8, p. 5; see also, Dkt. #8, Ex. L (PD 05.03.140(J)(3) (eff 1/01/2007)). Plaintiff has misrepresented this policy directive. It actually refers to parolees and probationers, who might be able to visit with approval of the warden and the supervising field agent. This policy directive specifically prohibits visitation by visitors who have visitor restrictions. PD 05.03.140(J)(1). If she were to conspire to smuggle in contraband, she would still be permanently banned pursuant to PD 05.03.140(PP)(1) ( eff 1/12/98); *see also* Section W(1) (eff 1/01/2007).

*of Corrections v. Thompson*, 490 U.S. 454, 460 (1989)(quoting *Board of Regents v. Roth*, 408 U.S. at 577), and must be based on more than 'a unilateral hope.'" *Thompson*, 490 U.S. at 460 (quoting *Connecticut Board of Pardons v. Dumschat*, 452 U.S. 458, 465 (1981)). In evaluating a claimed liberty interest by prison inmates, courts are mindful that imprisonment necessarily "carries with it the circumscription or loss of many significant rights." *Hudson v. Palmer*, 468 U.S. 517, 524 (1984). The "curtailment of certain rights is necessary, as a practical matter, to accommodate a myriad of 'institutional needs and objectives' of prison facilities, chief among which is internal security." *Id*. at 524 (internal citations omitted). Accordingly, not every "action taken for a punitive reason encroaches upon a liberty interest under the Due Process Clause. . . ." *Sandin v. Conner*, 515 U.S. 472, 484 (1995).[6] This is true, even if the action may limit certain rights of non-prisoners who have some relation to a prisoner.

*Meachum v. Fano*, 427 U.S. 215, 224 (1976), noted that "[o]ur cases hold that a convicted felon does not forfeit all constitutional protections by reason of his conviction and confinement in prison."). Prisoners retain a "residuum of constitutionally protected liberty," *Thompson*, 490 U.S. at 466 (Marshall, J., dissenting), that emanates from two discrete sources: (1) state law can establish a protectible liberty interest, or (2) the Constitution can create a liberty interest when a condition or restraint is so egregious as to implicate the Due Process Clause itself. *See Wilkinson v. Austin*, 545 U.S. 209 (2005).

---

[6] In *Thompson*, the Supreme Court stated that, "it [cannot be] seriously contended. . . . that an inmate's interest in unfettered visitation is guaranteed directly by the Due Process clause." *Thompson*, 490 U.S. at 460. As indicated above, the fact that Plaintiff is not a state prisoner does not give her a greater constitutional right in this area. The Sixth Circuit stated in *Thacker v. Campbell* that "[A] prison visitor has no liberty interest under the Due Process Clause in unlimited visitation with an inmate." *Thacker v. Campbell*, 1998 WL 537599 at *1 (6th Cir. 1998).

Plaintiff relies on the Sixth Circuit 2002 decision in *Bazetta v. McGinnis,* 286 F.3d 311, 323 (6th Cir. 2002)*,* when she quotes a "complete ban on all visitors is such a 'grievous loss' that infringes on liberty interest protected by substantive due process."

*Bazetta* involved regulations issued by the MDOC limiting the visitation rights of prisoners, including allowing the Director of the MDOC to restrict permanently all visits for a prisoner who is found guilty administratively of "[t]wo or more violations of the major misconduct charge of substance abuse," e.g. possession of narcotics, alcohol, unauthorized prescription drugs, or drug paraphernalia, or for failure to submit to a drug test. *Bazzetta,*286 F.3d at 321 & n. 2 (internal quotations omitted). Prisoners whose visits had been permanently restricted could still receive visits from "attorneys or [their] representative[s], [or] qualified clergy and staff from the Office of the Legislative Corrections Ombudsman. . . ." *Bazzetta v. McGinnis*, 148 F.Supp.2d 813, 833 (E.D. Mich. 2001). Inmates could also request that the visitation ban be lifted after six months or two years, depending on the underlying infractions. *Id.* Reinstatement of visitation privileges was within the warden's discretion. *Id.*

This district court found that the regulation involving a permanent ban, if reinstatement was not allowed, constituted a violation of the First Amendment right of association, the Eighth Amendment ban on cruel and unusual punishment, and the due process clause of the Fourteenth Amendment. In determining there was a liberty interest protected by the due process clause, the judge analyzed the regulations under the formulation established by the Supreme Court in *Sandin v. Conner*, 515 U.S. 472 (1995), which held that for plaintiff inmate to be constitutionally entitled to due process before being deprived of a particular right or privilege, he must show that being deprived of that right or interest imposes on him an "atypical and significant hardship"

relative to the ordinary circumstances of prison life.[7]  *Sandin* determined that discipline involving 30 days in segregated confinement did not present the type of atypical, significant deprivation in which a state might conceivably create a liberty interest and thus there could be no due process violation.

This court in *Bazzetta* found a visitation ban that was likely permanent was significant, thus a liberty interest existed.  *Id*. at 857.  This court found further that the process provided was not sufficient to satisfy the due process clause.  *Id*. at 858.  It is the 2002 Sixth Circuit affirmance of  this district court finding that Plaintiff cites in the present case.

The Supreme Court granted certiorari on the questions of "whether the regulations violate the substantive due process mandate of the Fourteenth Amendment, or the First or Eighth Amendments. . . ." *Overton*, 539 U.S. at 128.  The Court in *Overton* , however, did not grant certiorari on the issue of whether the regulations violated the prisoners' procedural due process rights under the Fourteenth Amendment which would have directly raised the issues involved in *Sandin*.

On the substantive due process issues under the First, Eighth and Fourteenth Amendment the Supreme Court reversed the lower courts  ruling that the regulations did not facially infringe

_____

[7]

 [W]e recognize that States may under certain circumstances create liberty interests which are protected by the Due Process Clause.  But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.

*Sandin*, 515 U.S. at 484 (citations omitted).

the prisoners' First Amendment rights of intimate association nor the Eighth Amendment.[8]  *Id.* at

131-36.  In so holding, the Court stated that it was not implying that "any right to intimate

association is altogether terminated by incarceration" but it noted that "[w]e must accord

substantial deference to the professional judgment of prison administrators, who bear a

significant responsibility for defining the legitimate goals of a corrections system and for

determining the most appropriate means to accomplish them." *Id.* at 131-32 ("Withdrawing

visitation privileges is a proper and even necessary management technique to induce compliance

with the rules of inmate behavior, especially for high-security prisoners who have few other

privileges to lose.").  The Court also held that the withdrawal of visitation privileges did not "fall

below the standards mandated by the Eighth Amendment." *Id.* at 137.

In its Eighth Amendment discussion, however, the Court borrowed some language from

*Sandin* when it noted that "withdrawal of visitation privileges for a limited period as a regular

means of effecting prison discipline . . . is not a dramatic departure from accepted standards for

conditions of confinement.  Cf. *Sandin v. Conner*, 515 U.S. 472, 485, 115 S.Ct. 2293, 132

L.Ed.2d 418 (1995)." *Overton*, 539 U.S. at 137.

While the district court stressed the permanent ban on visitation, the Supreme Court in its

opinion dealing with a facial attack on the regulation repeatedly referred to it as a two year ban.

It stressed this temporary nature of the ban in its discussion of both the First Amendment issue

_____

[8]  Other than its analysis of the substantive rights under First and Eighth Amendment
issues, the Court did not specifically or separately address the "substantive due process" rights
which it notes were also before the Court in the opinion's opening paragraph.  Yet, these issues
were effectively resolved in its brief Eighth Amendment analysis where it states, "Nor does the
regulation create inhumane prison conditions, deprive inmates of basic necessities, or fail to
protect their health or safety. Nor does it involve the infliction of pain or injury, or deliberate
indifference to the risk that it might occur."  *Id.* at 137 (Citations omitted).

and the Eighth Amendment issue.  In its First Amendment analysis, in addition to noting

alternative means still available to communicate by writing and phone, it stated

> And if faced with evidence that MDOC's regulation is treated as a *de facto* permanent ban on all visitation for certain inmates, we might reach a different conclusion in a challenge to a particular application of the regulation. Those issues are not presented in this case, which challenges the validity of the restriction on noncontact visits in all instances.

*Id.* at. 134.

Similarly, in its Eighth Amendment analysis, the Court stressed that "[i]f the withdrawal of all

visitation privileges were permanent or for a much longer period, or if it were applied in an

arbitrary manner to a particular inmate, the case would present different considerations." *Id.* at

137.  It concluded, however, that "[a]n individual claim based on indefinite withdrawal of

visitation or denial of procedural safeguards . . . would not support [a] ruling . . . that the entire

regulation is invalid." *Id.*  The lower court had found the regulation facially invalid under the

procedural due process clause.  A statute is facially unconstitutional only if no conceivable set of

circumstances exists under which it would be valid.[9]  Here the Supreme Court found that a ban

on visitation up to two years could serve a legitimate penological goal and thus the statute was

not unconstitutional on its face.

    The *Bazzetta* case was ultimately remanded to the district court "for further consideration

in light of the Supreme Court opinion." *Bazzetta v. McGinnis*, 73 Fed. Appx. 842 (6th Cir. 2003).

The Sixth Circuit noted that the Supreme Court had left open the question of whether "an

---

[9]  In other words, a "facial challenge" to the constitutionality of a statute means a claim that the law is invalid in toto and therefore incapable of any valid application.  Those making a challenge to a statute or regulation on its face and not as applied must show that "no set of circumstances exists under which the Act would be valid." *Webster v. Reproductive Health Services,* 492 U.S. 490, 524 (1989) (O'CONNOR, J., concurring).  *Ohio v. Akron Center for Reproductive Health* ,497 U.S. 502, 514, 110 S.Ct. 2972,**2980 - 2981 (U.S. Ohio 1990).

individual claim based on indefinite withdrawal of visitation or denial of procedural safeguards would pass muster under the First and Eighth Amendments. . . ." *Id.* (internal quotations omitted).

On remand, although the regulation was modified, this court, on December 23, 2003, without making any new or additional findings, determined that its earlier decision that there was a liberty interest in not having a permanent ban on visitation imposed without suitable procedural protections was unaffected by the Supreme Court's decision that did not address the procedural due process issues. *Bazzetta v. McGinnis,* Case No. 95-CV-73540, at Dkt. #375. On February 11, 2004, this Court certified for interlocutory review under 28 U.S.C. § 1292(b) the question of "whether prisoners have a liberty interest in visitation" and the Sixth Circuit accepted review of the injunctive order under 28 U.S.C. § 1292(a)(1).[10] *Id.* at Dkt. # 387. In a review under an "abuse of discretion" standard, the Sixth Circuit reversed this court's procedural due process holding in an opinion that could easily be misread as indicating there is no liberty interest in a permanent ban on visitation. *Bazzetta v. McGinnis,* Case No. 95-CV-73540, at Dkt. #394. *Bazzetta v. McGinnis*, 430 F.3d 795, 800 (6th Cir. 2005), r*ehearing en banc denied* ( March 9, 2006)*, cert. denied* 127 S.Ct. 381 (2006).[11]

---

[10] This is mistakenly noted in the opinion as 28 U.S.C. § 1291(a)(1) which does not exist. *Id.* at 800.

[11] In denying appellant fees, the Sixth Circuit noted this was a "closely litigated case." *Bazzetta v. Caruso*, 183 Fed.Appx. 514, *515, 2006 WL 1478517, **1 (6th Cir. 2006).
Moreover, as the Sixth Circuit recently observed, "the issues presented" in this case "posed significant public policy concerns and presented difficult and close legal issues to the courts" where "[t]he prisoners and their visitors initially prevailed" in the district court and the Sixth Circuit "but lost in the Supreme Court." *Bazzetta v. Caruso*, 183 Fed. Appx. 514, 515 (6th Cir. May 23, 2006) (rejecting a request that Plaintiffs be taxed costs in the amount of $16,208.25 because "[t]he litigation was taken in good faith, the case was difficult, and there is no necessity on the part of the prevailing party, the Michigan prison system, for a cost award."

While acknowledging that the Supreme Court did not rule on an "as applied" challenge to the visitation regulation in cases where there was a finding that there was an "indefinite withdrawal of visitation or denial of procedural safeguards" or "if faced with evidence that MDOC's regulation is treated as a *de facto* permanent ban on all visitation for certain inmates," the Sixth Circuit read the district court remand opinion as not an "as applied" ruling, but a facial attack on the substance of the visitation regulation and not merely an attack on its implementation. Specifically, the Sixth Circuit notes:

> The district court held that the substance abuse regulation, on its face, created a liberty interest because it imposed an "atypical and significant hardship" on all prisoners subject the restriction. See *Bazzetta* [v. McGinnis] , 148 F. Supp.2d [813] at 858 [(E.D. Mich. 2001)].

*Bazzetta*, 430 F.3d at 803.

It noted that the district court discussed examples of treatment of particular inmates to illustrate general procedural deficiencies in the implementation of the regulation, but the district court did not make any particular factual findings with respect to any particular prisoner sufficient to support an as applied procedural due process claim." *Id.* The Sixth Circuit noted that it was a "facial procedural due process challenged" that the Supreme Court in *Overton* impliedly foreclosed in its reference to *Sandin*.[12] Yet, the Sixth Circuit acknowledged that

---

[12] While the Sixth Circuit agreed that the Supreme Court did not grant *certiorari* or otherwise expressly address the procedural due process issue, nonetheless, the Sixth Circuit found that the Supreme Court "implicitly ruled on this issue, in a manner inconsistent with the holding of the district court." *Id.* at 802. The Sixth Circuit "extrapolate[d] from *Overton* and *Sandin* that the substance abuse regulation is neither a 'dramatic departure,' nor an 'atypical and significant hardship' in relation to the ordinary incidents of prison life." *Id.* Accordingly, the Sixth Circuit held that "although the issue was not directly before the *Overton* Court, Court precedent and dictum has signaled against our finding a liberty interest on the face of the substance abuse regulation." *Id.* at 803.

*Overton* left open an as applied challenge to a particular application of the substance abuse regulation under the First and Eighth Amendments as well as the procedural due process clause of the Fourteenth Amendment. *Id.* But a successful "individual claim based on indefinite withdrawal of visitation or denial of procedural safeguards . . . [does] not support the ruling . . . that the entire regulation is invalid." *Id.* citing *Overton*, 539 U.S. at 137.

In the context of the current regulations involving smuggling or "attempts to smuggle an item into or out of the facility," a temporary suspension of visitation, even a two year suspension as in *Overton,* would not constitute an "atypical and significant hardship" relative to the ordinary circumstances of prison life" when imposed for smuggling or attempts to smuggle narcotics or a cell phone but might be for an attempt to smuggle in brownies, a Time magazine or a photograph of a child. Similarly, a temporary suspension of visitation for some significant period might also be an "atypical and significant hardship" relative to the ordinary circumstances of prison life when imposed on a totally unsupported accusation of a corrections officer with no hearing or other rights to challenge the charge. Yet, the possibility of individual extreme cases where the smuggling regulation might be unconstitutional as applied do not invalidate it *in toto.*

In the present case, there is no evidence in the record from which to draw the full contours of the penological interest in keeping inmates [who commonly can make monitored phone calls] from having a cell phone.[13]  Cell phones seem relatively more benign in a prison context than drugs or weapons which were involved in other cases discussed above. Were this a case that involved a permanent termination of visitation between spouses it may be that some

---

[13] As noted in the discussion of the hearing evidence below, MDOC appears to have had additional concerns that the method of smuggling the cell phone was possibly a test for later smuggling of a hand gun.

peonological interest analysis concerning cell phones might be appropriate to determine if there was a liberty interest and whether a permanent termination of visitation between spouses for this offense was an "'atypical and significant hardship' relative to the ordinary circumstances of prison life." But currently the present case involves a suspension in the time parameters similar to the two year visitation suspension considered in *Overton*. In light of the teaching of *Overton* and the other cases on visitor restrictions, it cannot be said that Plaintiff's visitation restriction, on which notices were given in February 2006, is an 'atypical and significant hardship' relative to the ordinary circumstances of prison life."[14]

Yet, even if it were determined that a two year suspension of visitation of a spouse for attempting to smuggle a cell phone to the inmate gave rise to a liberty interest under the regulation,[15] Plaintiff was provided adequate procedural safeguards to defeat her due process claim.

**B.     *The Process***

The requirements imposed by the Clause are flexible and variable dependent upon the particular situation being examined. *See Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 12 (1979); *Morrissey v. Brewer*, 408 U.S. 471, 481, (1972). In determining what is "due process" in the prison context, "one cannot automatically apply procedural rules designed for free citizens in an open society. . . to the very different situation presented by a disciplinary proceeding in a

---

[14] The Supreme Court in *Overton* stated that "if faced with evidence that MDOC's regulation is treated as a *de facto* permanent ban on all visitation for certain inmates, we might reach a different conclusion in a challenge to a particular application of the regulation." Plaintiff has not proffered any evidence that this is the case here.

[15] It is significant that Prisoner King is not being restricted from receiving all visitors, just the one who was found to be involved in the attempted smuggling.

state prison." *Wolff v. McDonnell*, 418 U.S., at 560. "Prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520 (1979).

Plaintiff claims she was denied her rights under the Fourteenth Amendment when a visitor restriction hearing was conducted pursuant to MCL 791.251. Plaintiff claims that because she is not a prisoner, she should have a hearing in accordance with Michigan's Administrative Procedure Act of 1969. Yet, the APA exempts hearings held under MCL 791.251 from the requirements of this Act (Dkt. #7, Ex. 5, Administrative Procedures Act of 1969 § 24.315(2)).

MCL 791.206(1)(a) and (d) give to the Director of the MDOC the discretion to promulgate rules for the control, management and operation of the general affairs of the department as well as for the management and control of penal institutions. It is significant that this rule making power is discretionary. Furthermore, no statute attempts to set forth prison policy on visits from the general public or how such visits can be restricted. Visits and visitor restrictions are set forth in rules. These rules were amended, effective August 25, 1995. As noted above, in *Overton,* the Supreme Court found that prison regulations on visitation on their face did not violate due process if they were rationally related to legitimate penological objective, including the maintenance of internal security. *Overton*, 539 U.S. at 126.

R 791.6607, as amended August 25, 1995, provides:

(1) The department shall establish reasonable visiting hours and uniform quotas at each institution for visits to prisoner to promote order and security in the institutions and to prevent interference with institutional routine or disruption of the prisoner's programming. . .

R 791.6609, as amended August 25, 1995, provides:

(1) Except as otherwise provided in this rule, any person who is not subject to a current visitor restriction pursuant to the provisions of R 791.6611 may visit a prisoner if all of the following provisions are complied with:

* * *

(e) The visit does not constitute a threat to public safety or to the order and security of the institution.

* * *

(g) The purpose of the visit is not to commit an illegal act.

***

(2) Except as provided in R 791.6607(2) and subrule (3) of this rule, a person may visit a prisoner only if he or she is on the list of approved visitors for that prisoner, which shall consist of the prisoner's immediate family members and not more than 10 other persons. The approved visitors list shall be subject to all of the following restrictions:

* * *

(f) A warden may deny placement of anyone on a prisoner's approved visitors list for reasons of safety or security of the institution, protection of the public, previous violations of visiting room rules by the person, or for other cause as determined by the warden. A denial of placement on the list may be appealed through the prisoner grievance process.

* * *

(4) Each institution shall prescribe and display reasonable rules of conduct for visits to preserve public safety and institutional security and order and to prevent conduct that may be offensive to others who may be present. If a prisoner or visitor violates the provisions of this subrule, then the visit may be terminated and the prisoner and visitor may be subject of sanctions up to and including a permanent restriction of all visits or restriction to noncontact visiting only.

* * *

(13) Nothing in this rule creates an enforceable right of the prisoner to receive a visit

or of a visitor to visit a prisoner.

R 791.6611, as amended August 25, 1995 provides:

(2) A visitor shall be permanently restricted from visits at all facilities if any 1 of the following occurs:

(a) The visitor smuggles, or conspires or attempts to smuggle, any item into or out of the facility.

* * *

(4) When a visitor restriction is proposed by the institution, the visitor shall be temporarily restricted from visits at all facilities pending a formal hearing, pursuant to the provision of R 791.3315, to determine if the restriction is proper based upon the requirements of subrules (2) and (3) of this rule. The hearing shall be held within 30 business days of the date that notice of the hearing is mailed or given to the visitor, unless there is a reasonable cause for delay as determined by the hearing officer.

Policy directive 05.03.140 "Prisoner Visiting" (eff 01/01/2007) states, in the pertinent

part, as follows:[16]

NN. In the situations described below, a visit shall be terminated or disallowed and the visitor's visits with all prisoners:

1. The visitor smuggles, conspires to smuggle, or attempts to smuggle any item into or out of the facility. . .

***

PP. A visitor subject to a proposed visitor restriction shall be temporarily restricted from all visits pending a visitor restriction hearing.

QQ. If the incident leading to the proposed visitor restriction involved both the prisoner and the visitor, the prisoner shall be sent a Notice of Proposed Visitor Restriction (CSJ-315A) in addition to receiving a major misconduct report. The visitor shall be sent the Notice of Proposed visitor Restriction, a copy of the

---

[16] This policy directive was in effect at the time of Plaintiff's rehearing on April 11, 2007. PD 05.03.140 [eff 01/12/1998] was in effect at the time of the first hearing held on July 24, 2006. The provisions below are the same in both the 1998, and 2007 version, with the exception of the letters they are labeled.

> misconduct report and notice of the date of the visitor restriction hearing via first class mail to the address the visitor provided the facility at the time of the visit. Both the prisoner and the visitor are entitled to hearings conducted pursuant to R791.3315. The major misconduct hearing and the visitor restriction hearing shall be scheduled on the same date if possible.

(Dkt. #7, Ex. 6).

From the above cited rules and regulations, it is clear that the Department has determined that certain types of conduct from a visitor may result in the visitor being placed on a disapproved visitor's list, and may result in a hearing for the visitor. Plaintiff contends that since MCL 791.251 does not specifically state that the hearings division shall be responsible for conducting visitor restriction hearings on private citizens, that no rule, or policy directive of the Department of Corrections can be the basis for her being denied visits with any prisoner.

Yet, MCL 791.251 provides:

> (1) There is created within the department a hearings division. The division shall be under the direction and supervision of the hearings administrator who is appointed by the director of the department.

> (2) The hearings division shall be responsible for each prisoner hearing which the department conducts which may result in the loss by a prisoner of a right, including but not limited to 1 or more of the following matters:

> * * *

> (d) Visitor restrictions.

The wording of the statute does not limit the hearings division to only prisoner hearings. It simply lists those situations where the hearings division is mandated to conduct certain types of hearings. The Department has chosen to use hearings procedures that are already in place to conduct those visitor restrictions hearings that involve private citizens. There is nothing improper with using the MDOC Hearings Division to make factual findings in a visitor case.

In the present case, Plaintiff and her husband, who is under the jurisdiction of the

MDOC, were suspected of attempting to smuggle in a cell phone into the prison with the

assistance of some MDOC employees.  After an Internal Affairs investigation solidified the

suspicions regarding Plaintiff and her husband, they were given notice of a proposed visitor

restriction.  As described above, the hearing regarding visitor restriction was held under the

authority of MCL 791.251 and R791.6611.  R 791.6611(4) provides that when a visitor

restriction is proposed by a Department of Corrections' facility,  the prisoner and the visitor have

a right to a formal administrative hearing to be conducted pursuant to Administrative Rule

R.791.3315 to determine if the restriction is proper based on the requirements set forth in the rule

(Dkt. #7, Ex. 4).[17]  R.791.3315 provides in the pertinent part:

> (1) Not less than 24 hours before a formal hearing, a prisoner shall receive written
> notice of the hearing. The notice shall include all of the following:
>
> (a) Any charges of alleged violations.
> (b) A description of the circumstances giving rise to the hearing.
> (c) Notice of the date of the hearing.
>
> ***
>
> (5) A prisoner has all of the following rights at a formal hearing:
> (a) To be present and offer evidence, including relevant documents and oral and
> written arguments, on his or her own behalf.
> (b) To compel disclosure of documents specifically relevant to the issue before the
> hearing officer, **unless disclosure presents a threat to personal or institutional
> safety** (emphasis added).
> (c) To present evidence from necessary, relevant, and material witnesses, **when to
> do so is not unduly hazardous to institutional or safety goals** (emphasis added).
>
> ***
>
> (7) A staff investigator shall be available, when necessary, to gather and present

---

[17] PD 05.03.140, "Prisoner Visiting" sets forth the Michigan Department of Corrections
policy regarding visitor restrictions and required hearings.

factual evidence orally or in writing at the request of either the prisoner or the hearing officer. . . **The failure of a staff investigator to present requested documents or statements is justified if to do so would be unduly hazardous to institution or safety goals** (emphasis added). . .

      i.      <u>The July 24, 2006, Hearing</u>

Plaintiff claims that she did not attend the July 24, 2006, hearing because she was not given notice of the date. The notice of proposed visitor restriction was presented to Plaintiff on February 9, 2006, which she refused to sign (Dkt. #7, Ex. 3). The notice of proposed visitor restriction included a hearing date of March 15, 2006. *Id*. Defendant Baerwalde adjourned the hearing from March 15, 2006, because Plaintiff requested a waiver of time limits until the Michigan State Police Investigation had been completed (Dkt. #7, Ex. 7, Letter from Plaintiff to Hearings Investigator Gunter dated 6-22-06, 4, Att A). A Notice of Hearing was again sent on July 14, 2006, by Investigator Gunter informing Plaintiff of the hearing that was to be held on July 24, 2006 (Dkt. #7, Ex. 8, Affidavit of Ann Baerwalde, Att A). Plaintiff claims she did not receive this notice. At the hearing, Defendant Baerwalde found that Plaintiff had received notice of the hearing and the hearing was held without her in accordance with R.791.3315 (Dkt. #7, Ex. 4, Att A).

Plaintiff claims that she was denied due process because Defendant Baerwalde deemed the investigation and all material confidential at the hearing. According to R.791.3315(5)(b), a prisoner has the right at a formal hearing to compel disclosure of documents specifically relevant to the issue before the hearing officer, unless disclosure presents a threat to personal or institutional safety. In the first hearing, Defendant Baerwalde found that the information requested by Plaintiff was confidential because it revealed information related to the security of the facility (Dkt. #7, Ex. 8, p. 1). Defendant Baerwalde states, "Withholding the statements of

the confidential informant and information obtained in interviews with the informant is done to protect the identification and personal safety of witnesses as well as for the security of the facility." *Id.*

The information in the investigation included information regarding the institution and the investigation of employees of the institution. "Whether the informant is a prisoner is not relevant to such determinations, it is the safety of the witness that is at issue. Whether or not someone else had revealed the name of an alleged informant to Plaintiff is not a part of the determination of the need for exclusion of the evidence from full disclosure." *Id.* The information concerned a planned smuggling, and Defendant Baerwalde found that it was information that is a risk to the security of the prisons under control of Michigan Department of Corrections. *Id.*

Plaintiff also alleges that Defendant Caruso denied her all relevant exculpatory documents prior to the hearing, including the general allegations. Plaintiff requested copies of the Internal Affairs investigation pertaining to her husband, Prisoner Kevin King # 171671, and herself. Defendant Caruso denied her request in accordance with MCL 791.230a because the investigation involved MDOC employees (Dkt. #7, Ex. 9, Affidavit of Patricia Caruso, Att A). MDOC employee investigative files are personnel records and are therefore exempt from disclosure (Dkt. #7, Ex. 10, Exemptions from disclosure under Freedom of Information Act).

Although Plaintiff was not privy to the entire Internal Affairs investigation, she was fully aware of the allegations against herself and her husband. Prior to the first hearing, Plaintiff received the Notice of Proposed Visitor Restriction which stated: "Per the attached memo provided, you are said to have been conspiring to smuggle in a cell phone inside a cribbage

board." (Dkt. #7, Ex. 3).  The Proposed Visitor Restriction satisfied R.791.3315(1)(a) because it set forth the charges of alleged violations.  Additionally, for some time in 2006, Plaintiff was working with a lawyer.  On March 6, 2006, Plaintiff's lawyer, Tom Hirsbrunner, met with Mr. Marschke, manager of Internal Affairs, and was able to view certain evidence gathered by Internal Affairs.  He wrote a letter to Plaintiff describing the information viewed (Dkt. #7, Ex. 11, Letter from Plaintiff's lawyer describing evidence from the Internal Affairs investigation).  Mr. Hirsbrunner wrote Plaintiff that there was evidence regarding Prisoner Kevin King, her, and James Klein.  Plaintiff's lawyer revealed to her that there were written correspondences, drawings, diagrams, photographs, and retail store receipts.  Plaintiff was also told that there were audio recordings of at least two telephone calls between her and James Klein.  Through this information, Plaintiff was able to understand the general allegations against her.  She was told who the informant was, and was privy to the information that there were letters, drawings and diagrams regarding the cell phone and cribbage board smuggling allegation.

### ii.     April 11, 2007, Hearing

On August 19, 2006, Plaintiff requested the rehearing (Dkt. #7, Ex. 12).  Defendant Stapleton granted the rehearing pursuant to the same rules as the first hearing, Administrative Rules, R791.3315 and R791.6611.53 (Dkt. #7, Ex. 4, Att. B).  Although Plaintiff was present at this hearing, she claims that this second hearing was held in such a way, withholding all relevant material as confidential, that she could not exonerate herself of wrongdoing.  Again, although Plaintiff was not privy to the entire Internal Affairs investigation, she was fully aware of the charges of alleged violations against herself and her husband.

With her rehearing request, Plaintiff attached sixty-two pages of documents.  One

document Plaintiff had in her possession that she attached was an interview with Stephen Marschke; Manager of Internal Affairs dated February 13, 2006 (Dkt. #7, Ex. 13, Interview with Stephen Marschke; Manager of Internal Affairs). The document described the investigation in detail. It stated that Prisoner King wanted the informant, who at this point she knew was James Klein, to contact his wife to help her have a cell phone smuggled into MRF inside a cribbage board, as a dry run. If that was successful, Prisoner King then wanted the informant to smuggle a .22 caliber handgun into MRF inside another hollowed out cribbage board. The document also stated the dates and substance of two conversations between Plaintiff and James Klein. It stated the dates and times the two met in person and what occurred at those times. From this document, Plaintiff also found out she was photographed at the informant's home when she went there to give him the cell phone. The phone was also identified as a Cingular phone.

Also attached to the rehearing request was a list of questions Plaintiff wanted to be put on the record (Dkt. #7, Ex. 14). Additionally, Plaintiff attached a statement she wrote with her request for rehearing (Dkt. #7, Ex. 15). In this statement she again goes over the interview with Stephen Marschke, and disputes the allegations. Plaintiff claims that it is impossible to smuggle a gun or a cell phone into a ½ inch piece of wood. On April 5, 2007, Plaintiff submitted another statement to Hearing Investigator Durant. In this statement she disputes the facts and allegations of the entire investigation (Dkt. #7, Ex. 16). In her statement she refers to "Exhibit K," which is a Michigan State Police Report (Dkt. #7, Ex. 17). This report fully details the investigation including the substance of phone calls between Plaintiff and James Klein, and the details on how they were going to attempt to smuggle in the cell phone.

Here, Plaintiff claims that she was denied the general allegations against her.[18] Yet, with the amount of documents Plaintiff had in her possession regarding time of conversations, substance of conversations, and details of the plan to smuggle in the phone, Plaintiff was fully aware of the charges against her and was able to, and did, prepare a defense. Consistent with *Overton*, the prison regulations on visitation did not violate Plaintiff's due process rights because they were rationally related to legitimate penological objectives, including the maintenance of internal security. *Overton*, 539 U.S. at 163. Plaintiff is subject to the jurisdiction of the Michigan Department of Corrections with regard to prisoner visitation, and the hearing held under MCL 791.251 is not a violation of Plaintiff's procedural due process. In accordance with R 791.3315, Plaintiff was given the charges of alleged violations, a description of the circumstances giving rise to the hearing, and notice of the date of the hearing was mailed out. Even if she did not receive notice of the original hearing, a rehearing was granted in accordance with MCL 791.254 and R 791.3320.62, and she was able to attend this second hearing. Under R 791.3315, both Hearing Officers and staff investigators can deny disclosing information if it is a threat to safety. The Defendants followed the procedures set forth under MCL 791.251 to deny

---

[18] Administrative R 791.3315(7) provides "[a] staff investigator shall be available, when necessary, to gather and present factual evidence orally or in writing at the request of either the prisoner or the hearing officer. . . The failure of a staff investigator to present requested documents or statements is justified if to do so would be unduly hazardous to institution or safety goals." On April 4, 2007, Plaintiff wrote Hearing Investigator Durant requesting material, including the informant's (James Klein) original statement (Dkt. #7, Ex. 18). Hearing Investigator Durant denied Plaintiff's request because of the confidential content of the material (Dkt. #7, Ex. 19). Pursuant to R791.3315 (7), Hearing Investigator Durant was able to deny Plaintiff requested information since it was information regarding smuggling and would be hazardous to institution or safety goals. It also protected the confidentiality of the informant.

visitation to Plaintiff thereby affording Plaintiff due process.[19]

### 3. *Plaintiff's Equal Protection Claim*

Plaintiff claims that her right to equal protection was violated when a hearing was conducted pursuant with MCL 791.251 in regards to her visitation rights. In order to state an equal protection claim based on discriminatory acts, a §1983 plaintiff must allege that a state actor intentionally discriminated against the plaintiff because of his or her membership in a protected class. *See Henry v. Metro. Sewer Dist.*, 922 F.2d 332, 341 (6th Cir.1990). Moreover, conclusory allegations of unconstitutional conduct are insufficient to state a claim under §1983 – some factual basis for the claim must be set forth in the pleadings. *Lillard v. Shelby County Bd. of Educ.*, 76 F.3d 716, 726 (6th Cir.1996). Accordingly, to be in violation of the Constitution, unequal enforcement of the laws must be based upon "race, religion, or some other arbitrary classification," and "there must be an affirmative showing of clear and intentional discrimination." *Butcher v Department of Natural Resources*, 158 Mich. App. 704, 708 (1987).

In Plaintiff's Complaint, she does not claim to be a member of any specific group singled out for differential, discretionary treatment, and provides no evidence that she was denied

---

[19] Moreover, "when an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply *res judicata* to enforce repose." *University of Tennessee v. Elliott*, 478 U.S. 788, 797-98 (1986)(quoting *United States v. Utah Construction & Mining Co*., 384 U.S. 394, 421-22 (1966)). As previously stated, Plaintiff had an adequate opportunity to discover the substance of the charges and present her defense, and the hearing officers in both hearings found that the informant, James Klein, was credible, and that Plaintiff and her husband were conspiring to smuggle in a cell phone. *See* Dkt. #7, Ex. 4, Att A & C. "Federal district courts...do not sit as appellate courts to review the factual findings of hearing officers in prison misconduct hearings. [I]f. . . there was a dispute as to the factual circumstances surrounding any given incident, it was the function of the hearing officer, not this court, to resolve it." *Shelly v. Johnson*, 684 F.Supp. 941, 945 (W.D. Mich. 1987). Therefore, since the hearing officer properly decided that Plaintiff had been conspiring to smuggle, this Court should apply *res judicata*.

visitation based upon her membership in any particular group. She has made only conclusory assertions that "Defendants' actions violated. . .Plaintiffs Equal Protection rights. . . ."(Cplt, ¶ 1). In her response to Defendants' motion, she claims that "visitors" are a protected class, but she cites no law supporting her conclusion (Dkt. #8, p. 27). "'[U]nless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage, our decisions presume the constitutionality of the statutory discriminations and require only that the classification challenged be rationally related to a legitimate state interest.'" *Wilson v Yaklich*, 148 F3d 596, 604 (CA 6, 1998)(quoting *City of New Orleans v. Dukes*, 427 U.S. 297 (1976)). Plaintiff's classification as a "prison visitor" does not trammel on a fundamental personal right. The hearing set for in MCL 791.251 provided her adequate due process. Additionally, she is not claiming that she received unequal enforcement of the law based upon "race, religion, or some other arbitrary classification." Prisoners are not considered members of a protected class, *Jackson v. Jamrog*, 411 F.3d 615, 619 (6th Cir. 2005), and neither are their visitors.

Moreover, Plaintiff has not shown any disparate treatment. Plaintiff has not set forth any evidence that she was treated any differently than another visitor who has been suspected of smuggling contraband into the facility. She was provided a hearing and a rehearing that were held under MCL 791.251 to decide if her husband could receive her as a visitor, and she has failed to show that she was discriminated against during or in furtherance of these proceedings. Any other visitor who was suspected of attempting to smuggle in contraband would have the same hearing held under MCL 791.251. Plaintiff cannot allege that she is a "class of one" because she would still have had to put forth facts that she had been intentionally treated

differently from others similarly situated (other prison visitors) and that there is no rational basis for the difference in treatment. *Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

Because Plaintiff does not allege the violation of a fundamental right, or the existence of a suspect classification, "prison officials need only show that their policies bear a rational relation to a legitimate penological interest in order to satisfy the Equal Protection Clause." *Thacker*, 1998 U.S. App LEXIS at *5. Defendants' interest in maintaining orderly visitation between inmates and visitors and safety in the facility is rationally related to their decision to terminate Plaintiff's visitation because of her planning to smuggle in a cell phone to her husband.

4.  ***Defendant Baerwalde is an Administrative Law Judge, and is entitled to dismissal on the grounds of absolute immunity.***

Plaintiff claims that because Defendant Baerwalde held the visitation hearing in accordance with MCL 791.251 to 791.256 rather than under the APA, her First and Fourteenth Amendment rights were violated. As shown above, Plaintiff's constitutional rights were not violated. Moreover, Defendant Baerwalde is entitled to absolute immunity as an Administrative Law Examiner. *See Shelly v. Johnson*, 849 F.2d 228 (6th Cir. 1988)(holding prison hearing officer was entitled to absolute judicial immunity from inmate's § 1983 civil rights action in relation to actions taken in his capacity as hearing officer, in view of hearing officer's status as attorney specially appointed to conduct prison disciplinary hearings as full-time judicial officer, wholly independent of warden and other prison officials). Under the doctrine of judicial immunity, judges are generally immune from suits seeking money damages based on their judicial acts. *Johnson v. Turner*, 125 F.3d 324, 333 (6th Cir. 1977). The doctrine is justified "by a long settled understanding that the independent and impartial exercise of judgment vital to the judiciary might be impaired by exposure to potential damages liability." *Barnes v. Winchell*, 105

38

F.3d 1111, 1115 (6th Cir.1997)[quoting *Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429, 435 (1993)]. This principle of independent decision-making is so important to our system of jurisprudence that judicial immunity even extends to allegations of judicial acts done incorrectly, maliciously or corruptly. *See Stump v. Sparkman*, 435 U.S. 349, 356 (1978).

Federal courts have attempted to give a flexible definition of what constitutes a judicial act. In *Morrison v. Lipscomb*, 877 F.2d 463, 465 (6th Cir.1989), for example, the Court, citing *Forrester v. White*, 484 U.S. 219, 227 (1988), stated that the paradigmatic judicial act is the resolution of a dispute between parties who have invoked the jurisdiction of the court. In *Forrester*, the Court explained that an act "does not become less judicial by virtue of an allegation of malice or corruption of motive." *Forrester*, 484 U.S. at 227. Therefore, Plaintiff has failed to state a claim against Defendant Baerwalde upon which relief can be granted, and any such claims should be dismissed with prejudice.

### 5. *Defendants have not violated a clearly established statutory or constitutional right, therefore they are entitled to dismissal on the grounds of qualified immunity.*

Government officials who perform discretionary functions are also generally entitled to qualified immunity from individual liability for civil damages so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997); *Noble v. Schmitt*, 87 F.3d 157, 160 (6th Cir. 1996); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity is an affirmative defense and the plaintiff need not anticipate it in the complaint. *Gomez v. Toledo*, 446 U.S. 635 (1980). Once a defense of qualified immunity is asserted, the plaintiff must respond with "specific, non-conclusory allegations of fact that will enable the district court to

determine that those facts, if proved, will overcome the defense of qualified immunity." *Veney v. Hogan*, 70 F.3d 917, 922 (6th Cir. 1995). A Court faces a two part test when ruling upon a qualified immunity issue. The initial inquiry must be whether, considered in the light most favorable to the party claiming injury, the facts establish that the officer's conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001) (citing *Siegert v. Gilley*, 500 U.S. 226, 232 (1991)). If the facts alleged would violate a constitutional right, the second question is whether that constitutional right was clearly established at the time. *Id.*; *Summar v. Bennet*, 1957 F.3d 1054, 1058 (6th Cir. 1998).

In this case the first step is to determine whether the facts alleged show the Defendants' conduct violated a constitutional right. Plaintiff has not alleged facts sufficient to show that her First and Fourteenth Amendment rights were substantially burdened. Plaintiff also has not alleged any facts to support her equal protection claim, so that claim also fails under the first portion of the qualified immunity test. Therefore, the Court should grant Defendant Caruso, Defendant Stapleton, and Defendant Baerwalde qualified immunity.

## III.   RECOMMENDATION

For the reasons indicated above, it is **RECOMMENDED** that Defendants' motion be **GRANTED**, and this case be dismissed. The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections

which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local*, 231, 829 F.2d 1370,1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Date: January 18, 2008           s/Steven D. Pepe
Ann Arbor, Michigan           United States Magistrate Judge

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing ***Report and Recommendation*** was served on the attorneys and/or parties of record by electronic means or U.S. Mail on January 18, 2008.

s/ Alissa Greer
Case Manager to Magistrate
Judge Steven D. Pepe
(734) 741-2298